**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JUSTIN ROCHE, | ) | CASE NO. 1:17CV177 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Justin Roche ("Plaintiff" or "Roche"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Child's Insurance Benefits and Supplemental Security Income

("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et*

*seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be VACATED and the case REMANDED

for further consideration consistent with this decision.

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I. PROCEDURAL HISTORY

In December 2013, Roche filed applications for Child's Insurance Benefits and SSI, alleging a disability onset date of September 26, 2010 (later amended to December 16, 2013) and claiming he was disabled due to "lung problems, asthma, foot ankle deformity on both feet, trouble balancing and standing due to severe pain, anxiety, severe asthmatic, [and] bronchitis." (Transcript ("Tr.") 17, 196-197, 202-203, 210, 217.) The applications were denied initially and upon reconsideration, and Roche requested a hearing before an administrative law judge ("ALJ"). (Tr. 137-139, 140-142, 161-162.)

On December 8, 2015, an ALJ held a hearing, during which Roche, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 36-64.) On February 2, 2016, the ALJ issued a written decision finding Roche was not disabled. (Tr. 17-34.) The ALJ's decision became final on January 3, 2017, when the Appeals Council declined further review. (Tr. 1-4.)

On January 26, 2017, Roche filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 11, 12.) Roche asserts the following assignments of error:

> (1) The ALJ violated the treating physician rule by failing to give good reasons for rejecting Dr. Ravakhan's [sic] opinions.
>
> (2) The ALJ failed to give appropriate weight to the opinions of non-treating, consultative physicians.

(Doc. No. 11.)

# II. EVIDENCE

## A. Personal and Vocational Evidence

Roche was born in August 1994 and was nineteen (19) years-old at the time of his amended onset date and twenty-one (21) years old at the time of his administrative hearing, making him a "younger" person under social security regulations. (Tr. 26.) *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). He has a limited education and is able to communicate in English. (Tr. 26) He has no past relevant work. (*Id.*)

## B.     Relevant Medical Evidence[2]

On June 22, 2012, Roche began treatment with Keyvan Ravakhah, M.D. (Tr. 532-536.) Roche reported a past history of asthma, ankle problems, losing his balance, and numbness in his fingers. (Tr. 532.) During this visit, he complained of progressive low back pain and bilateral ankle pain, as well as a rash on his hands and legs. (Tr. 532-533.) On examination, Dr. Ravakhah observed normal pulses, sensation, reflexes, coordination, and muscle strength and tone. (Tr. 534.) He also noted hyperlaxity of both ankles. (Tr. 534.) Dr. Ravakhah diagnosed possible obstructive sleep apnea, asthma, biliary colic, contracture of ankle and foot joint, and obesity. (Tr. 535.) He advised Roche to undergo a sleep study, prescribed asthma medication, and referred Roche to a podiatrist for his ankle and foot issues. (*Id.*)

Roche presented to podiatrist Michael B. Canales, D.P.M., on July 17, 2012. (Tr. 492-493.) Dr. Canales recorded Roche's complaints as follows:

> The patient is referred to me . . . for painful ankles and feet bilaterally. This has been a problem for this young man almost his entire life. It is getting unbearable. He is unable to stand in the shower or stand for long periods of time. It is very difficult for him to walk. He is a new patient. The patient rates the pain as 10/10. The pain is described as throbbing and aching. The patient is experiencing calf pain, chest pain, and shortness of breath. The patient states that walking,

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

standing, stairs, and running (can't run) exacerbate the pain. Rest makes it feel better. The patient has seen no one for the treatment of this problem and had no treatments. The pain is preventing him from doing everyday things. The patient's goals of treatment are to ease the pain and walk with no pain. The patient denies any other history of musculoskeletal, foot or ankle problems, but his lower back hurts due to ankles.

(Tr. 492.) On examination, Dr. Canales found intact sensation, no peripheral edema, normal reflexes, and 5/5 manual muscle testing for all major muscle groups. (Tr. 492-493.) He also noted (1) "severe collapse of the medial longitudinal arch" on weightbearing examination; (2) reducible deformity; (3) normal subtalar joint range of motion; (4) mild peroneal tendon spasm; and (5) "decreased dorsiflexion with the knee extended and knee flexed consistent with gastroc-soleal equinus." (*Id.*) X-rays of Roche's bilateral feet taken that date showed "severe uncovering of the talus," transverse plane deformity, severe plantar flexion of the talus, and decreased calcaneal pitch. (*Id.*)

Dr. Canales diagnosed (1) "severe *pes valgo planus* with concomitant gastoc-soleal equinus (severely flexible flatfoot deformity, which is symptomatic);" and (2) obesity. (*Id.*) He concluded "[t]his is a significant deformity that may require surgery in the future;" however, he advised first trying "functional bracing." (*Id.*) Dr. Canales believed the braces would help Roche's functioning, but noted Roche "is likely looking at surgical intervention in the future." (*Id.*) He also "had a frank discussion" with Roche about the importance of weight loss. (*Id.*)

On April 5, 2013, Roche presented to the emergency room ("ER") with complaints of swollen hands. (Tr. 311-317.) He reported "he woke up at around midnight with swelling of his hands and some paresthesias and burning sensation," and indicated his "symptoms have persisted." (Tr. 314.) Roche also reported extremity pain, but denied difficulty walking. (Tr. 315.) ER records indicate Roche ambulated with a "steady gait." (Tr. 312.) On examination of

4

Roche's hands, ER physician Ewald Kundtz, M.D., noted intact sensation, strength, and pulses, as well as good capillary refill. (Tr. 316.) No edema, erythema, or weakness was observed. (*Id*.) Dr. Kundtz diagnosed bilateral hand paresthesias of unclear etiology, and discharged Roche with instructions to follow up with his primary care physician. (Tr. 317.)

Roche returned to Dr. Canales on September 10, 2013. (Tr. 491.) Roche reported the foot braces were "too painful." (*Id*.) Examination findings were the same as the previous visit. (*Id*.) Dr. Canales also noted Roche was "walking with a cane at this time." (*Id*.) He prescribed a prefabricated arch support and Vicodin. (*Id*.) Dr. Canales also "expressed to the patient's father that we may need to discuss surgical intervention if conservative management has failed as this is affecting his son's activities of daily living." (*Id*.)

Roche next presented to Dr. Canales on October 15, 2013. (Tr. 490.) Roche reported the arch supports "helped him significantly" and reduced his pain by 50%. (*Id*.) Dr. Canales was "pleased to see that Justin is doing well with his foot orthotics" and noted "it will take him 3-4 months to get the maximum benefit of the arch supports." (*Id*.) He further stated "[i]f we need to move forward with surgical intervention, it is something I am very comfortable with." (*Id*.)

Roche was hospitalized the following month, from November 24 through November 27, 2013, for bronchitis and an asthma exacerbation. (Tr. 303-310, 331-336, 328-330, 325-327, 320-324, 318-319.) Examination revealed wheezing in both lungs, and fine crackles in the left lung base. (Tr. 318.) A chest x-ray taken on the date of admission, November 24, 2017, showed (1) left basal airspace disease; and (2) "mild prominence of perihilar markings, consider reactive airways disease." (Tr. 553.) Roche underwent an additional chest x-ray two days later, which showed "persistent basal airspace disease, without significant interval change." (Tr. 552.)

On December 13, 2013, Roche returned to Dr. Ravakhah with complaints of cough, chest pain, and a rash. (Tr. 412-418.) Dr. Ravakhah noted Roche's recent hospitalization and indicated he was "improved but still . . . symptomatic." (Tr. 412.) Dr. Ravakhah also remarked Roche "still has some pain in his ankles when he stands up." (*Id*.) Examination revealed mild shortness of breath, mild tachychardia, and tenderness in Roche's bilateral ankles. (Tr. 412-413.) Dr. Ravakhah assessed asthma, obstructive sleep apnea, rosacea, ankle pain, obesity, and high blood pressure. (Tr. 415-416.) He referred Roche to a pulmonologist, and advised him to undergo a sleep study "ASAP." (Tr. 415.) Dr. Ravakhah also "discussed the importance of regular exercise and recommended starting or continuing a regular exercise program for good health." (Tr. 416.) He encouraged Roche to lose weight. (*Id*.)

Roche presented to Ohio Chest Physicians on December 19, 2013. (Tr. 399-401.) The physician's name is illegible and the treatment note is difficult to read; however, it appears Roche was continued on his asthma medications and again advised to undergo a home sleep study. (Tr. 401.)

On January 24, 2014, Roche returned to Dr. Ravakhah with complaints of bilateral ankle, knee, and lower back pain. (Tr. 407-411.) Roche rated the pain a 5 on a scale of 10, and indicated this was "baseline for him." (Tr. 407.) On examination of Roche's extremities, Dr. Ravakhah found 5/5 motor strength, intact reflexes, and normal sensation. (*Id*.) He also noted Roche wore bilateral ankle braces. (*Id*.) Dr. Ravakhah advised Roche to continue his pain medications (Tramadol and Vicodin), and counseled him regarding weight loss and exercise. (Tr. 410-411.)

Several weeks later, on March 14, 2014, Roche presented to the ER with complaints of

abdominal pain.  (Tr. 293-302.)  An x-ray of his abdomen was unremarkable, and Roche was discharged home in stable condition with a diagnosis of constipation.  (Tr. 296, 301, 551.) Roche returned to the ER on April 7, 2014 with flu-like symptoms and shortness of breath.  (Tr. 283-292.)  His lungs were clear on examination, with no wheezes, rales, or rhonchi.  (Tr. 289.) Roche underwent an EKG, which was normal.  (Tr. 291.)  A chest x-ray showed improved left lower lobe infiltrate with residual minimal plate atelectasis and/or scarring.  (Tr. 291, 550.) Roche was discharged home with a prescription for steroids.  (Tr. 291.)

Roche returned to Dr. Ravakhah on May 23, 2014 with complaints of hives and swelling in his bilateral forearms, sore throat, and body ache.  (Tr. 471-475.)  Dr. Ravakhah described Roche's knee and back pain as stable and advised him to continue his medications.  (Tr. 475.) He also stated Roche was "disabled from my standpoint," and completed a disability form for Roche on that date.  (*Id.*)

In the disability form (entitled "Medical Source Statement: Patient's Physical Capacity"), Dr. Ravakhah described Roche's pain as "moderate."  (Tr. 470.)  He concluded Roche's abilities to lift/carry, stand, and walk were affected by his impairments; i.e., his ankle, knee, and spinal pain.  (Tr. 469.)  Although the form asked for specific limitations in these areas, Dr. Ravakhah declined to specify any particular restrictions or limitations on Roche's abilities to lift/carry, stand, and/or walk.  (*Id.*)  Dr. Ravakhah concluded Roche's ability to sit was not affected by his impairments.  (*Id.*)  He found, however, Roche could only occasionally climb and kneel, and rarely balance, stoop, crouch, and crawl, due to his "joint issues."  (*Id.*)

With regard to manipulative limitations, Dr. Ravakhah found Roche could frequently engage in reaching and fine manipulation; occasionally engage in gross manipulation; and rarely

push or pull.  (Tr. 470.)  He concluded Roche was restricted from working around heights,

moving machinery, temperature extremes, and pulmonary irritants.  (*Id.*)  He noted Roche had

been prescribed a cane, and found he would need to be able to alternate between sitting,

standing, and walking at will in order to "help him with balance [as] he uses a cane."  (*Id.*)  Dr.

Ravakhah also found Roche would require additional unscheduled rest periods during an 8 hour

workday (outside of normal breaks).  (*Id.*)  Finally, Dr. Ravakhah opined Roche's pain would

interfere with his concentration, take him off task, and cause absenteeism.  (*Id.*)

On July 8, 2014, Roche returned to Dr. Canales with complaints of severe foot pain.  (Tr.

489.)  He reported the pain had "steadily gotten worse," and had progressed to the point "that he

cannot even stand in the shower without significant pain."  (*Id.*)  Roche indicated the braces were

"providing little relief."  (*Id.*)  Dr. Canales noted intact sensation, 5/5 muscle strength, and

normal reflexes.  (*Id.*)  On orthopedic examination, he found severe collapse of the medial

longitudinal arch with forefoot abduction, and "decreased dorsiflexion with the knee extended

and knee flexed consistent with gastroc-soleal equinus."  (*Id.*)  Dr. Canales also noted Roche was

"unable to perform a double limb heel rise test or single limb heel rise test."  (*Id.*)  He diagnosed

(1) *pes planus* with posterior tibial tendon dysfunction; and (2) flatfoot deformity (moderate to

severe).  (*Id.*)  Dr. Canales concluded as follows:

> I believe the patient would benefit from surgical intervention, as does his father.
> The patient is in agreement.  This would be a major reconstructive undertaking
> approximately a year to a year and a half recovery for each foot.  The patient
> would require surgical intervention for this operation and this would be
> performed under general anesthesia for approximately 2 ½ hours per operation.
> He would be following up with Dr. Joseph Sopko in the upcoming weeks for
> pulmonary evaluation.  I would like to see the patient back in one month.  I did
> provide him a prescription for Vicodin.  He is permitted one tablet at night as
> needed for pain.  I have also written a prescription for physical therapy for
> functional evaluation and capacity evaluation in addition to a prescription for a

shower chair. This patient is so young and his painful deformities have affected his life in a negative way.

(*Id*.)

Roche presented for an orthopedic evaluation for purposes of physical therapy on July 23, 2014. (Tr. 516-520.) Roche reported he began using a single point cane in approximately 2010, and stated he used a rolling walker for long distances such as the grocery store. (Tr. 516.) He also reported balance deficits, including "multiple falls with about 2 per week." (*Id*.) He complained of "constant, throbbing" ankle, knee and lower back pain, which he rated a 9 on a scale of 10. (Tr. 517.)

Physical therapist Brittany Nelson noted intact sensation and impaired, antalgic gait. (Tr. 516, 518.) She also found (1) reduced (i.e., 2-3/5) hip strength on extension and abduction; (2) reduced (i.e., 3+/5) knee strength on flexion; and (3) reduced (i.e., 2-3/5) ankle strength on plantar flexion, dorsiflexion, inversion, and eversion, bilaterally. (Tr. 517-518.) Ms. Nelson also noted tenderness to palpation of Roche's bilateral plantar fascia, and impaired balance. (Tr. 518.) She concluded Roche's "foot and ankle ability measure 13%, indicating 87% functional impairment." (*Id*.) Roche's "problem list" included decreased endurance, decreased range of motion, decreased strength, fall risk, impaired ambulation, impaired balance, impaired posture, pain, impaired functional level, and impaired functional mobility. (Tr. 519.) Some exercises were performed during this session, although Ms. Nelson noted Roche was unable to perform certain exercises due to pain. (*Id*.) Roche's rehabilitation potential was assessed as "good." (Tr. 520.)

Roche presented for physical therapy on August 6 and August 26, 2014. (Tr. 560-561, 562-563.) On both occasions, he reported foot pain which he rated an 8 on a scale of 10. (*Id*.)

On August 6th, the physical therapist noted Roche "performed very slowly and was quickly fatigued." (Tr. 560.) She also noted that, during certain exercises, Roche complained of foot numbness and hand pain. (*Id.*) On August 26th, Roche reported having fallen due to his ankle buckling. (Tr. 562.) The therapist again noted several of the exercises were "very challenging," and indicated a balance exercise was "discontinued due to very challenging with whole body tremors due to weakness and fatigue." (*Id.*) A treatment note from September 2014 indicated Roche's physical therapy was "put on hold by MD." (Tr. 564.)

On August 22, 2014, Roche returned to Dr. Ravakhah. (Tr. 537-542.) He reported frequent asthma attacks (three per week) "because of the hot weather." (Tr. 540.) Roche also complained of bilateral knee and ankle pain, which he described as "throbbing" and rated a 7-10/10. (*Id.*) He stated the pain was worse with activity and indicated that "after 5 minutes he has to lay down and rest for it to go away." (*Id.*) Roche also reported bilateral hand pain for the previous two to three months. (*Id.*) He also suffered from bilateral hand weakness, indicating it was hard for him to grip things and type. (*Id.*) Finally, Roche reported experiencing headaches "when trying to concentrate." (Tr. 541.)

On examination, Dr. Ravakhah noted (1) tremor in both hands when arms are extended; (2) painful PIP and DIP joints in both hands; (3) pain with thumb abduction; (4) decreased range of motion in Roche's bilateral lower extremities; (5) decreased muscle strength; (6) normal pulses; and (6) unstable gait. (Tr. 541.) Dr. Ravakhah assessed arthritis and ordered blood work. (Tr. 538.)

Roche returned to Dr. Canales on August 26, 2014. (Tr. 543.) Examination findings were the same as his previous visit. (*Id.*) Dr. Canales noted Roche had not yet obtained a

pulmonary consultation and indicated "I do believe the patient could benefit from surgical intervention but I will not move forward until appropriate medical consultations have been made." (*Id.*) He further indicated "I do not think that this problem will improve with nonoperative measures, as the deformity is severe." (*Id.*)

On September 16, 2014, Roche presented to the ER with complaints of shortness of breath, cough, and chest pain. (Tr. 565-576, 605-614.) On examination, Roche's lungs were clear and his respirations were unlabored, although he was "slightly tachychardic." (Tr. 573.) Examination of his extremities was normal, with full range of motion, intact sensation and motor, no tenderness or edema, and normal gait. (*Id.*) A chest x-ray taken that date showed no radiographic evidence of acute cardiopulmonary process; however, ER physician Dr. Kundtz interpreted it to show a right lower lobe infiltrate. (Tr. 549, 575-576.) Dr. Kundtz decided to treat Roche for pneumonia and admitted him to the hospital overnight. (Tr. 576.)

Roche returned to Ohio Chest Physicians on October 9, 2014. (Tr. 652.) He was again advised to schedule a home sleep study. (*Id.*) Roche subsequently underwent the sleep study on October 31, 2014. (Tr. 653.) This study revealed (1) mild obstructive sleep apnea; and (2) mild noctural hypoxia secondary to sleep apnea. (*Id.*)

On November 11, 2014, Roche returned to Dr. Canales with complaints of "debilitating foot pain that continues to get worse." (Tr. 651.) Dr. Canales noted intact sensation, 5/5 muscle strength, and normal reflexes. (*Id.*) On orthopedic examination, he found severe collapse of the medial longitudinal arch with forefoot abduction, and "decreased dorsiflexion with the knee extended and knee flexed consistent with gastroc-soleal equinus." (*Id.*) Dr. Canales also noted Roche was "unable to perform a double limb heel rise test or single limb heel rise test." (*Id.*)

Dr. Canales again stated Roche would benefit from surgical intervention. (*Id*.) He ordered a CAT scan for surgical planning, and advised Roche to return "in three weeks for full surgical consultation in the presence of his mother and father who are here today." (*Id.*)

Roche next presented to Dr. Canales on January 27, 2015. (Tr. 650.) Examination findings were the same as the previous visit, with the additional finding that "on weightbearing examination, the patient's medial malleolus is purchasing the ground." (*Id*.) Dr. Canales noted Roche was having difficulty obtaining the CT scan, which Dr. Canales felt was "instrumental in surgical planning." (*Id.*) He advised him to return the following week for further surgical consultation. (*Id*.)

On May 29, 2015, Roche began treatment with rheumatologist Isam Diab, M.D. (Tr. 643-648.) He complained of "stiffness and pain all over," particularly in his neck and back. (Tr. 643.) On examination, Dr. Diab noted Roche's lungs were clear with normal breathing sounds, and no wheezing, crackles or crepitus. (*Id*.) He also found as follows:

> **Musculoskeletal exam**: Muscle strength. Difficult to evaluate because of stiffness, but 4-5/5 in shoulder and hip girdle muscles, normal flexor muscles of the neck, normal grips. Modest tenderness over cervical, thoracic, and lumbar spine, mainly spinous process, moderate tenderness over SI joints, right more than the left. Tender achilles tendons and the heels, bilaterally. Shober's test is positive. Moderate decrease in range of motion of cervical and thoracolumbar spine in all directions. Also tender over multiple enthesis at different joints.

(*Id*.) Dr. Diab assessed seronegative spondylopathy with "no sign of opthalmologic or other organ involvement." (*Id*.) He noted "thoracic and lumbar spondylosis should be kept in mind as a cause for current symptoms." (*Id*.) Dr. Diab also diagnosed "mechanical derangement, both ankles, using special orthotic." (*Id*.) He ordered x-rays of Roche's spine and SI joint; prescribed Naprosyn and Omeprazole; and recommended exercises. (*Id*.)

Roche underwent x-rays of his SI joint, lumbar spine, and thoracic spine that same day. (Tr. 648, 649, 638.)  The SI joint x-ray was negative.  (Tr. 648.)  The lumbar spine x-ray showed "slight narrowing of the posterior disc . . . at L3 and L4 disc level as well as the L2 level which could indicate early degenerative changes."  (Tr. 649.)  The thoracic spine x-ray showed "moderate to mild convex-right scoliosis in the midthoracic spine."  (Tr. 638.)

Roche returned to Dr. Diab on July 10, 2015.  (Tr. 664.)  He reported he was "doing the same more or less, 20% better, still having modest upper and lower back stiffness, minimal pain off-and-on, more so with in the morning and with inactivity, also increase with bending and lifting, no radiation to lower limbs."  (*Id.*)  On examination, Dr. Diab reported the same musculoskeletal findings as the previous visit, and also observed the following:

> Modest synovitis, at first, second, and third PIP joints, right hand more than the left with some synovial thickening.  Mild decrease in flexion at PIP's.  Mild synovitis and synovial thickening at second MCP right hand, third MCP left hand. Modest synovitis with moderate tenderness over medidal side of the right wrist more than the left, with modest synovial thickening.  Mild synovitis, swelling and warmth with modest tenderness anterior right ankle more than the left, tarsal joint and metatarsophalangeal joints bilaterally.

(Tr. 664.)  He diagnosed seronegative sypondylopathy, peripheral polyarthritis, kyphoscoliosis, and mechanical derangement of both ankles.  (*Id.*)  Dr. Diab recommended stretching, isometric, range of motion, and water exercises, but advised Roche to avoid lifting or pushing heavy objects.  (*Id.*)  He continued Roche on Naprosyn and Omeprazole, and added a prescription for Sulfasalazine.  (*Id.*)

Roche next returned to Dr. Diab on September 25, 2015.  (Tr. 663.)  Examination findings and diagnoses were the same as the previous visit.  (*Id.*)  Dr. Diab discontinued Roche's prescription for Sulfasalazine due to side effects, including tremors in Roche's tongue.  (*Id.*)

Roche also reported migraines and imbalance, causing Dr. Diab to refer him for a neurological consultation. (*Id.*)

On October 14, 2015, Roche began treatment with neurologist Howard Tucker, M.D. (Tr. 674-678.) Roche reported having "blackout spells which occur for 1 or 2 seconds," losing his words, and "episodes in which his tongue feels as if it is going back." (Tr. 674.) He also complained of ringing in his ears, "a peculiar sensation on the top of his head," migraine headaches three to four times per month, and episodes of "zoning out." (*Id.*) On neurologic examination, Dr. Tucker noted no focal deficits, and normal reflexes, coordination, muscle strength, and tone. (Tr. 676.) He indicated Roche "cannot walk without the bracing and does use a cane. Strength is good throughout and there is no limb ataxia. Tendon reflexes are hypoactive throughout and toes signs are flexor." (Tr. 677.) Dr. Tucker diagnosed (1) seizure disorder, complex partial; (2) migraine headache; (3) arthritis; (4) lumbago; (5) obesity; and (6) contracture of ankle and foot joint. (Tr. 677-678.) He ordered an MRI of Roche's brain and an EEG, and prescribed Keppra and Sulfadiazine. (*Id.*)

Roche returned to Dr. Tucker on November 2, 2015. (Tr. 670-673.) He reported "the Keppra has reduced the frequency of the headaches but he cannot state whether or not these spells have diminished." (Tr. 670.) Roche underwent an EEG that date, which was normal. (Tr. 670, 679.) On examination, Dr. Tucker noted clear lungs, normal pulses, "no deformity or scoliosis noted with normal posture and gait," and "no clubbing, cyanosis, edema, or deformity . . . with normal full range of motion of all joints." (Tr. 672.) Dr. Tucker started Roche on Dilantin and noted "Keppra will be gradually reduced and eliminated." (Tr. 670.)

On December 18, 2015, Roche presented to Dr. Tucker with complaints of "staring spells

[that] occur multiple times each day," during which he "loses track of time." (Tr. 666.) Roche's mother indicated Roche "sits at the table and just stares and . . . stays in his room oftentimes and won't come out because he is aware of them." (*Id.*) Roche also reported lower back pain, which he rated a 7 on a scale of 10. (Tr. 667.) On examination, Dr. Tucker noted normal reflexes, coordination, muscle strength and tone. (Tr. 668.) He indicated Roche "walks with a cane but there is no ataxia nor nystagmus to suggest drug toxicity." (*Id.*) Dr. Tucker increased the dosage of Dilantin and concluded Roche "should be followed more closely to try and get these staring spells under control." (Tr. 666.)

**C.     State Agency Reports**

**1.     Physical Impairments**

On April 8, 2014, Roche underwent a consultative physical examination with Hasan Assaf, M.D. (Tr. 457-467.) Roche reported a history of asthma and stated his symptoms included shortness of breath, wheezing, and cough. (Tr. 457.) He stated he was hospitalized at the age of two for pneumonia and blood infection, and kept in an induced coma for 1 ½ months. (*Id.*) Roche indicated he underwent physical therapy when he was discharged and "probably was taught in a wrong way because he started developing foot deformity in both feet as well as pain on standing and walking." (*Id.*) Roche stated "the pain is an aching pain if he is not weightbearing, but becomes 10/10 pain if he walks for more than three to five minutes." (*Id.*) He reported the pain mainly involves his ankles, worse on the right than the left. (*Id.*)

Roche also reported pain in his knees and low back since the age of two. (Tr. 458.) He indicated "the pain in the knees is not present if he is not weightbearing, but occurs if he stands and walks for more than five minutes." (Tr. 458.) Roche's low back pain "comes and goes, but

is constantly present if he is sitting for a long time, standing for a long time, or walking as well as bending and lifting." (*Id.*) Roche also complained of frequent headaches, and stated he was told he had fatty liver and gallbladder disease. (*Id.*)

On examination, Dr. Assaf found as follows:

> The claimant walks with abnormal gait. He has a flat foot gait. He also walks slightly bent forward. The claimant states that he cannot walk on heels and toes because of his feet. Squat is limited to 30 degrees. The claimant's stance is abnormal in that he stands slightly bending forward. The claimant uses a cane. He uses it for pain and weightbearing. He uses it all the time. It is self-prescribed. In my opinion, the use of the cane is medically necessary. Needed no help changing for exam or getting on and off exam table. Able to rise from chair without difficulty.

(Tr. 459-460.) Dr. Assaf noted no scoliosis, kyphosis, or abnormality in Roche's thoracic spine. (Tr. 460.) Straight leg raise was negative bilaterally, and Roche's joints were stable and nontender except for tenderness over the right and left ankles and knees. (*Id.*) An x-ray of Roche's right ankle showed increased talocalcaneal angle, and *pes planus* (i.e., flat feet). (Tr. 461, 463.)

Manual muscle testing of Roche's shoulders, elbows, wrists and fingers was normal, as was his grasp, manipulation, pinch, and fine coordination. (Tr. 464.) Range of motion testing of Roche's cervical spine, shoulders, elbows, wrists, and hands/fingers was also normal. (Tr. 465-466.) Roche did show reduced range of motion on flexion and extension of his dorsolumbar spine; flexion of his right hip and knee; and plantar flexion and inversion of his right and left ankles. (Tr. 466-467.)

Dr. Assaf diagnosed the following conditions: (1) asthma; (2) right and left ankle pain, right more than left; (3) bilateral flat feet; (4) right and left knee pain, cause unknown; (5) low back pain, probably lumbar strain; (6) history of chronic constipation; (7) history of fatty liver;

and (8) obesity. (Tr. 461.) He opined "[t]here are marked limitations in activities requiring prolonged standing, walking, bending, lifting, and squatting." (*Id*.)

On April 11, 2014, state agency physician Leslie Green, M.D., reviewed Roche's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 76-78.) Dr. Green determined Roche could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of 4 hours; and, sit for a total of about 6 hours in an eight hour workday. (Tr. 77.) Dr. Green noted "[a] medically required hand-held assistive device is necessary for ambulation." (*Id*.) She limited Roche to occasional pushing and pulling. (*Id*.) She explained her findings as follows:

> Clmt is obese w/ankle pain, standing/walking limited to 4/8 hrs. Uses ankle braces . . . Occas[ional] push/pull. Pain also taken into consideration. Can carry files less than 2 [pounds] when ambulating with cane in non-cane arm.

(*Id*.)

With regard to postural limitations, Dr. Green found Roche could never climb ladders, ropes, or scaffolds; occasionally climb ramps/stairs, balance, kneel, crouch, and crawl; and frequently stoop. (Tr. 77.) She specifically noted Roche could not ambulate on "moving, wet, uneven terrain." (*Id*.) Finally, with regard to environmental limitations, Dr. Green concluded Roche should avoid all exposure to hazards, and avoid concentrated exposure to extreme cold and heat, humidity, vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. 78.)

On August 10, 2014, state agency physician Esberdado Villanueva, M.D., reviewed Roche's medical records and completed a Physical RFC Assessment. (Tr. 112-114.) Dr. Villaneuva reached the same conclusions as Dr. Green. (*Id*.)

**2.     Mental Impairments**

On February 18, 2014, Roche underwent a consultative psychological examination with

Mitchell Wax, Ph.D.  (Tr. 420-424.)  Roche reported he had dropped out of school in the 11th grade due to leg pain, and because he was made fun of by other students.  (Tr. 421.)  He lived with his family and reported no previous work history.  (*Id.*)  Roche indicated medical problems including ankle deformity and asthma.  (*Id*.)  He reported no prior psychiatric hospitalizations or psychiatric care, and indicated he was not in counseling.  (*Id.*)

As for his daily activities, Roche stated he did not do any housework or cook, although he acknowledged he knew how to make breakfast and microwave meals.  (Tr. 421-422.)  He stated he watches television for about six hours a day and does not visit with anyone other than family.  (Tr. 422.)  Roche reported going to the grocery store monthly with his parents, but stated he uses a wheelchair.  (*Id*.)

On mental status examination, Dr. Wax found Roche "presented as an anxious, obese youth, who had poor social skills." (Tr. 422.)  He noted Roche "walked awkwardly to and from today's evaluation room" and "was clumsy, hitting doors and walls with his bag" of papers.  (*Id*.)  Dr. Wax further observed Roche was "often vague and circumstantial and had difficulty answering simple questions," often appearing hesitant.  (*Id*.)  He noted Roche appeared anxious and noted "intermittent fidgeting."  (*Id.*)

With regard to Roche's cognitive functioning, Dr. Wax concluded Roche appeared to be in the "average range of intelligence."  (Tr. 423.)  Roche was inattentive and needed questions simplified and repeated, and his ability to concentrate was intermittent.  (*Id*.)  Dr. Wax found no major memory problems, noting Roche could recall five digits forward and four digits backward; remember all three of three simple words on a recognition task after approximately five minutes; and was able to add by 3s to 40 and subtract 7s from 100.  (*Id*.)

Dr. Wax diagnosed personality disorder with dependent features.  (Tr. 423.)  He observed

Roche was "totally taken care of by his parents," describing him as a "shut in."  (Tr. 422, 423.)

As a result, Dr. Wax concluded Roche "would be vulnerable to exploitation if he were to live on

his own."  (Tr. 423.)  With regard to the four functional areas, Dr. Wax concluded as follows:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions**.
This individual would be able to understand, remember, and carry out simple instructions on a job.  His estimated IQ is in the average range of intelligence, though he left school in the 11th grade, "It was hard for me to walk around in school, and kids made fun of me."  Because of his dependent personality disorder, he did need questions simplified during today's evaluation.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multistep tasks.**
This individual would be able to maintain attention and concentration to work at a job.  He is able to watch television during the day at home, and is able to play video games and board games with his family in the evening.  He was able to maintain attention and concentration during today's evaluation, though he did frequently expect questions to be simplified for him.  He is not persistent, and does not do household chores at home, "I can't. lt's my legs." He is totally cared for by his family.  He is able to perform simple tasks and perform multi-step tasks based upon his ability to play video games and board games at home.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting**.
This individual would have difficulty responding appropriately to supervisors and coworkers in a work setting based upon his functioning during today's evaluation. He presented with poor social skills. He did have difficulty getting along with other students while in public school. Because of his poor social skills, it is believed he would have difficulty getting along with others on a job.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**
This individual would not respond appropriately to work pressures in a work setting.  He withdraws when he feels pressure.  He left public school because he did not feel comfortable. Because of his personality disorder, he would not respond appropriately to work pressures in a work setting.

(Tr. 424.)

19

On February 26, 2014, state agency psychologist Courtney Zeune, Psy.D., reviewed Roche's medical records and completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment. (Tr. 75, 78-80.) In the PRT, Dr. Zeune determined Roche was mildly restricted in his activities of daily living, and had moderate difficulties in maintaining both social functioning and concentration, persistence, and pace. (Tr. 75.) Dr. Zeune further noted no repeated episodes of decompensation, each of extended duration. (*Id.*)

In the Mental RFC Assessment, Dr. Zeune concluded Roche was "capable of understanding and remembering simple and some multi-step instructions." (Tr. 79.) She found Roche was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) Dr. Zeune explained Roche "is cognitively intact, but [due] to lack of formal work history would likely require a work setting with flexible production quotas." (*Id.*) With regard to social interaction limitations, Dr. Zeune found Roche was moderately limited in his abilities to (1) interact appropriately with the general public; (2) accept instructions and respond appropriately to criticism from supervisors; and (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 79-80.) She explained as follows:

> Due to lack of formal work history and limited activities outside of the home, clmt would benefit from a supportive supervisor who provides constructive feedback and hands on instruction for skill development. Initially, he would do best in a setting which minimized the need for social interactions.

(Tr. 80.)

Finally, with regard to Roche's adaptation limitations, Dr. Zeune found Roche was moderately limited in his abilities to (1) respond appropriately to changes in the work setting;

20

and (2) set realistic goals or make plans independently of others.  (*Id.*)  Dr. Zeune explained:

> Due to lack of formal work history, clmt would need some additional time to adapt to changes in the work place.  Although he may initially need some encouragement or support to adapt, there are no other psychological limitations which would impair his adaptability.

(*Id.*)

On March 21, 2014, state agency psychologist Leslie Rudy, Ph.D., was asked "to determine if evidence supports the proposed PRT/MRFC" submitted by Dr. Zeune.  (Tr. 246.) Dr. Rudy found the medical evidence from Roche's treating physician did "not document complaints of anxiety, problems with social interactions, or establish any psychological [medically determinable impairments]."  (*Id.*)  She further noted "there is no allegation or evidence that clmt has ever sought mental health treatment, including medication, for symptoms described as anxiety."  (*Id.*)  Dr. Rudy found it was not unreasonable to conclude, as Dr. Zeune did, that Roche's mental limitations stemmed from his lack of experience with work expectations and that his functioning "would be moderately limited by his dependent personality style."  (Tr. 247.)

On August 19, 2014, state agency psychologist Carl Tishler, Ph.D., reviewed Roche's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 110-111, 114-116.) Dr. Tishler reached the same conclusions as Dr. Zeune.  (*Id.*)

**D.    Hearing Testimony**

During the December 8, 2015 hearing, Roche testified to the following:

- He left high school in the 10th grade because he was having trouble concentrating.  (Tr. 44.)  At the time, his GPA was a 3.8.  (Tr. 45.)  He lives with his mother, father, and younger sister.  (Tr. 44.)

- The "biggest problem" that prevents him from working is his spinal impairment,

and the symptoms he experiences from his "waist down." (Tr. 48.) He started using a cane two years ago because of "balance issues." (Tr. 51.) His doctors did not prescribe the cane, but agreed he should use it. (*Id.*) He uses the cane "all the time," even when he is inside in the house. (Tr. 51-52.) He also wears bilateral braces for his ankles. (Tr. 52.) He is taking arthritis medication, but it is not helping. (Tr. 48-49.)

- He also experiences hand pain, numbness, and swelling. (Tr. 50, 54-55.) His hands swell every day. (Tr. 54-55.) As a result of his hand symptoms, he has difficulty carrying things and writing. (*Id.*) In addition, after playing video games for 20 to 30 minutes, his hands feel cold and numb, "like bricks." (Tr. 50.)

- In addition to the above symptoms, he frequently "zones out." (Tr. 56.) He described "zoning out" as being "almost like a daydream," i.e., his "loses his words," loses track of time, and is forgetful. (*Id.*) This problem has been getting worse lately, and he recently began treatment with a neurologist. (*Id.*) The neurologist had not yet offered a diagnosis. (*Id.*)

- He can stand for five minutes at one time before experiencing increased pain. (Tr. 52-53.) He can walk for seven minutes before experiencing pain in his spine, hips, knees, and ankles. (Tr. 53.) He can sit for ten minutes, after which he feels numb from the waist down. (*Id.*) He cannot carry a gallon of milk because his arm starts to hurt. (Tr. 54.)

- He can bathe himself, but has difficulty dressing himself. (Tr. 45.) His mother helps him tie his shoes. (*Id.*) He is not able to help with any household chores. (*Id.*) He does not drive, has never driven, and does not have a driver's license. (*Id.*) He does not use public transportation. (*Id.*) His parents drive him where he needs to go. (*Id.*)

- He watches television, listens to music, and plays video games. (Tr. 46.) He can only play video games for 20 to 30 minutes at one time, however, because he needs to change positions and his hands become cold and numb. (Tr. 50.) When watching television, he either lays down or sits in a recliner. (Tr. 46.) He eats meals in a recliner in his room because the kitchen chairs are too hard. (Tr. 51.) He does not lift or carry anything around the house. (Tr. 54.) He does not go outdoors. (Tr. 47.) He tries to exercise on a treadmill and, during the summer, in the pool. (*Id.*)

The VE testified Roche had no past work. (Tr. 59.) The ALJ then posed the following hypothetical question:

First off, I would like you to consider a person with the same age, education, and past work as the claimant who is able to occasionally lift and carry ten pounds [and] frequently lift and carry five pounds. Is able to stand and walk two hours of an eight-hour workday; is able to sit for six hours of an eight-hour workday. Push and pull would be limited in both lower extremities to occasional push and pull. This individual can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; could occasionally balance, kneel, crouch and crawl, and stoop. This individual must avoid concentrated exposure to extreme cold and extreme heat. They must avoid concentrated exposure to humidity and vibration, and avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation and must avoid all exposure to hazards such as, unprotected heights, uneven terrain, and hazardous machinery. Finally, this hypothetical individual can perform simple, routine tasks consistent with unskilled work with no fast pace or high production quotas, and with infrequent change, where those changes can be easily explained, and finally can have superficial interaction with others and by superficial I mean of a short duration for a specific purpose. Since there is no past work, given such a hypothetical individual, would there be any jobs for such a hypothetical individual?

(Tr. 59-60.)

The VE testified the hypothetical individual be able to perform representative jobs in the economy, such as bonder (sedentary, unskilled, SVP 2); touch-up screener (sedentary, unskilled, SVP 2); and patcher (sedentary, unskilled, SVP 2). (Tr. 60.)

The ALJ then asked the VE to consider the same hypothetical with the additional limitation that the hypothetical individual "requires the use of a cane for ambulation." (Tr. 61.) The VE testified the hypothetical individual would be able to perform the three previously identified jobs because "there's no essential functions that needs to be done ambulating." (*Id.*)

The ALJ then added the additional limitation that the individual was limited to frequent handling and fingering bilaterally. (Tr. 61.) The VE again testified the hypothetical individual would be able to perform the three previously identified jobs. (Tr. 62.) Finally, the ALJ asked the VE to "assume that this hypothetical individual might be off task approximately 20% of the time due to issues with either chronic pain or the need to take unscheduled breaks." (*Id.*) The

VE testified that "[n]o, at 20% they would not be able to meet the competitive production rate."

(*Id.*)

Roche's counsel then asked the VE to consider the following hypothetical:

Q:      Mr. Anderson, if we go back to hypothetical #1, actually #2, the individual uses a cane, but if I add in that the individual needs to change position essentially at will, but as frequently as sitting 20 minutes and the needing to stand five minutes and when he's standing, he is using the cane, could the jobs that you've identified still be performed with that -- one, with that frequent of a change of position, and using the cane when he's standing?

A:      Well, even with the -- the jobs I cited will allow for a change of position, but the hand would need to be unencumbered, and if he's doing it every twenty minutes for five minutes, he's going to be off task more than would be allowed -- had he -- if he has to stop production. So he could change positions but he needs to have the – both hands unencumbered.

Q:      Okay.  All right, and that – it's going to get to the off task issue?

A:      It's going to get to the off task issue, yes.

(Tr. 63.)

Roche's counsel then asked "if rather than having frequent handling and fingering, if the individual has frequent fingering but only occasional handling could the individual still perform the jobs?"  (Tr. 63.)  The VE testified this hypothetical individual could not perform the three previously identified jobs of bonder, touch-up screener, and patcher.  (*Id.*)  The VE testified the individual could perform the job of credit information clerk, but then noted "in the hypothetical we have superficial contact with others and so that job would be eliminated."  (Tr. 63-64.)

### III.    STANDARD FOR DISABILITY

The Social Security Act mandates the satisfaction of three basic criteria to qualify for child's insurance benefits of an insured, namely, the child must: (1) have filed an application for

such benefits; (2) have been unmarried at the time of the filing and must have been either: (i) under eighteen years of age or a full time elementary or secondary school student under nineteen, or (ii) under a disability which began before age 22; and (3) have been dependent upon the parent at the time the application was filed if the parent is still living or, if the parent is deceased, at the time of the parent's death. 42 U.S.C. § 402(d)(1).

A disabled claimant may also be entitled to receive SSI benefits.[3] 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under

---

[3] The Child's Insurance Benefits and SSI regulations are generally identical. *See Peshe v. Comm'r of Soc. Sec.*, 2015 WL 6437216 at fn 2 (N.D. Ohio Oct. 22, 2015).

20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. Born on August *** 1994, the claimant had not attained age 22 as of December 16, 2013, the alleged amended onset date (20 CFR 404.102, 416.120(c)(4), and 404.350(a)(5)).

2. The claimant has not engaged in substantial gainful activity since December 16, 2013, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3. The claimant has the following severe impairments: osteoarthritis (bilateral ankles/hands), bilateral flat feet, lumbago/degenerative disc disease, asthma, obesity, and personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant: can occasionally lift and carry 10 pounds and frequently lift and carry five pounds; can stand and walk two hours in an eight-hour workday; can sit for six hours in an eight-hour workday; can only occasionally push and pull with the bilateral lower extremities; can occasionally climb ramps and stairs; cannot climb ladders, ropes, and scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to extreme cold

and extreme heat, humidity, vibration, fumes, doors, dusts, gases, and poor ventilation; must avoid all exposure to hazards such as unprotected heights, uneven terrain, and hazardous machinery; will require the use of a cane for ambulation; can perform frequent handling and fingering bilaterally; can perform simple, routine tasks (unskilled work) with no fast pace or high production quotas; can only tolerate infrequent changes where changes can be easily explained; can only tolerate superficial interaction with others (meaning a short duration for a specific purpose); and can perform low stress work meaning no arbitration, negotiation or the responsibility for the safety of others or supervisory responsibility.

6.  The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August ** 1994 and was 19 years old, which is defined as a younger individual age 18-44, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 16, 2013, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g), and 416.920(g)).

(Tr. 17-27.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### *Treating Physician Dr. Ravakhah*

In his first assignment of error, Roche argues the ALJ erred in failing to accord "controlling weight" to the May 2014 opinion of Dr. Ravakhah. (Doc. No. 11 at 13.) He maintains treatment records are supportive of Dr. Ravakhah's opinion, arguing "the nature and extent of the relationship established Dr. Ravakhah as eminently qualified in his position to assess Mr. Roche, the opinion is consistent with treatment notes, both before and after the opinion is issued, and Dr. Ravakhah also made effort to find further treatment for Mr. Roche with specialists." (*Id.* at 14.) Roche further asserts the ALJ erred in failing to articulate "good

reasons" for discounting Dr. Ravakhah's specific opinions that (1) Roche would need to alternate between sitting and standing; (2) he would require the use of a cane for balance while standing; and (3) his pain would interfere with concentration, lead to off-task behavior, require additional breaks, and cause absenteeism. (*Id*. at 15, 21.) He maintains the ALJ improperly "played doctor," stating "the ALJ's emphasis on the . . . lack of pain management treatment (Tr. 25) usurps the role of these doctors, and exceeds the ALJ's role and knowledge base." (*Id*. at 17.)

The Commissioner argues the ALJ properly evaluated Dr. Ravakhah's opinion. She first questions whether Dr. Ravakhah constitutes a "treating physician" under social security regulations, arguing his treatment of Roche was "sparse" and primarily related to conditions other than Roche's chronic pain. (Doc. No. 12. at 19.) The Commissioner then notes the ALJ did not reject Dr. Ravakhah's opinion but, rather, expressly accorded it "some weight" and incorporated in the RFC Dr. Ravakhah's opinions that Roche needed an assistive device and had no limitation in sitting. (*Id*. at 18.) Nonetheless, and assuming *arguendo* Dr. Ravakhah constitutes a treating source, the Commissioner asserts the ALJ articulated "good reasons" for declining to adopt Dr. Ravakhah's opinion, arguing "[t]he ALJ recognized that the opinion provided no specific functional limitations and the statements about plaintiff's pain were not supported by the greater weight of the record, as plaintiff did not pursue formal pain management and treatment records showed conservative treatment and stable symptoms." (*Id*. at 20-21.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). Medical

opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source

of the opinion . . . dictates the process by which the Commissioner accords it weight." *Id.* "As a

general matter, an opinion from a medical source who has examined a claimant is given more

weight than that from a source who has not performed an examination (a 'nonexamining

source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly

treats the claimant (a 'treating source') is afforded more weight than that from a source who has

examined the claimant but does not have an ongoing treatment relationship (a 'nontreating

source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.* In other words, "[t]he regulations provide

progressively more rigorous tests for weighing opinions as the ties between the source of the

opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2

(Soc. Sec. Admin. July 2, 1996).

A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"is not inconsistent with the other substantial evidence in [the] case record." *Gayheart,* 710 F.3d

at 376; 20 C.F.R. § 404.1527(c)(2).[4] However, "a finding that a treating source medical opinion

. . . is inconsistent with the other substantial evidence in the case record means only that the

opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p,[5] 1996 SSR

LEXIS 9 at *9). Indeed, "[t]reating source medical opinions are still entitled to deference and

---

[4] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[5] SSR 96-2p has been rescinded. This recession is effective for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298 at *1.

must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."

*Blakley*, 581 F.3d at 408.[6]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not

give a treating-source opinion controlling weight, then the opinion is weighed based on the

length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating

source's area of specialty and the degree to which the opinion is consistent with the record as a

whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

     If the ALJ determines a treating source opinion is not entitled to controlling weight,

"the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See*

*also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a

sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,'

particularly where a claimant knows that his physician has deemed him disabled and therefore

'might be bewildered when told by an administrative bureaucracy that she is not, unless some

reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378

F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the

---

[6] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[7]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of

---

[7] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the ALJ determined, at step two, that Roche had the severe impairments of osteoarthritis (bilateral ankles/hands), bilateral flat feet, lumbago/degenerative disc disease, asthma, obesity, and personality disorder.  (Tr. 19.)  After finding Roche's impairments did not meet or equal the requirements of a Listing, the ALJ proceeded to consider the medical evidence regarding Roche's physical and mental impairments at step four.  (Tr. 20-26.)  With regard to Roche's back, knee, ankle, and foot pain, the ALJ acknowledged medical records documenting flat feet, abnormal gait, tenderness over the ankles and knees, and Roche's need for a cane.  (Tr. 23.)  However, the ALJ found Roche's "extremity pain and tenderness have never become so severe that formal pain management was warranted, and it is persuasive that he does not require a back or shoulder brace."  (*Id*.)  The ALJ also noted normal examination findings in the record, including findings of negative straight leg raise, "equal extremity pulses with no significant variscosities or trophic changes," no abnormalities in Roche's thoracic spine, and "generally stable and non-tender" joints during Dr. Assaf's physical consultative examination.  (*Id*.)  Further, the ALJ characterized Roche's treatment in 2013 as "minimal to sporadic" and stated "heel implants provided significant pain relief with respect to his flat foot deformity and lower extremity dysfunction." (Tr. 24.)  The ALJ also noted "while lower extremity surgery was recommended, the claimant never followed up and his orthopedic therapy did not last for 12 months or more."  (*Id*.)

The ALJ then considered the medical opinion evidence.  (Tr. 25-26.)  With regard to Roche's physical impairments, the ALJ accorded "some weight" to the opinion of consultative

examiner Dr. Assaf, and "some weight" to the opinions of state agency physicians Drs. Green

and Villanueva. (*Id.*)  The ALJ analyzed Dr. Revakhah's opinion as follows:

> The undersigned has also considered the medical source statement from Dr.
> Keyvan Ravakhan [sic].  (10F).  However, only some weight could be accorded
> because just as with Dr. Assaf, some portions of the opinion are not actual
> functional opinions to include Dr. Ravakhan [sic] not detailing how limited the
> claimant's abilities to lift, carry, stand, and walk actually were.  Moreover, his
> opining to the claimant experiencing intense pain is unsupported by the greater
> weight of the record to include the claimant not being in formal pain management
> and Dr. Ravakhan's [sic] own treatment records showing such conservative
> treatment (see 11F, 13F, 15F, and 16F generally).  Yet, his opinion still supports
> the RFC found by the undersigned, as Dr. Ravakhan [sic] did opine that despite
> the claimant needing an assistive device, he could still perform some posturals
> and had an unlimited ability to sit.  Hence, some weight is accorded to Dr.
> Ravakhan [sic].
>
> No weight, however, is accorded to Dr. Ravakhan's [sic] second opinion that the
> claimant was disabled.  He cited no objective evidence in support of his
> contention, and the finding of a person as disabled is a conclusion that is reserved
> to the Commissioner.  Hence, no weight is accorded (15F/3).

(Tr. 26.)

The ALJ formulated the following RFC: "After careful consideration of the entire

record, the undersigned finds that the claimant has the residual functional capacity to perform

sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant: can

occasionally lift and carry 10 pounds and frequently lift and carry five pounds; can stand and

walk two hours in an eight-hour workday; can sit for six hours in an eight-hour workday; can

only occasionally push and pull with the bilateral lower extremities; can occasionally climb

ramps and stairs; cannot climb ladders, ropes, and scaffolds; can occasionally balance, stoop,

kneel, crouch, and crawl; must avoid concentrated exposure to extreme cold and extreme heat,

humidity, vibration, fumes, doors, dusts, gases, and poor ventilation;  must avoid all exposure to

hazards such as unprotected heights, uneven terrain, and hazardous machinery; will  require the

35

use of a cane for ambulation; can perform frequent handling and fingering bilaterally; can perform simple, routine tasks (unskilled work) with no fast pace or high production quotas; can only tolerate infrequent changes where changes can be easily explained; can only tolerate superficial interaction with others (meaning a short duration for a specific purpose); and can perform low stress work meaning no arbitration, negotiation or the responsibility for the safety of others or supervisory responsibility." (Tr. 22.)

Before determining whether the ALJ complied with the treating physician rule, the Court must first determine whether the source constitutes a "treating" source. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)). Here, the Commissioner suggests Dr. Ravakhah did not constitute a "treating physician" for purposes of social security regulations at the time he authored his May 2014 opinion. (Doc. No. 12 at 19.) She notes Roche saw Dr. Ravakhah on four occasions prior to this opinion (in June 2012, December 2013, January 2014, and May 2014), and argues each of these visits primarily related to "acute illnesses" rather than to Roche's chronic pain. (*Id.*) Thus, the Commissioner argues "[i]t is questionable whether Dr. Ravakhah's infrequent interaction with plaintiff . . . gave him any particular enhanced insight into plaintiff's foot and ankle condition as of May 2014." (*Id.*)

A treating source must have "an ongoing treatment relationship with" the claimant, and the frequency of treatment must be "consistent with accepted medical practice" for the claimant's condition. 20 C.F.R. §§ 404.1502 and 416.902. *See Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 273 (6th Cir. July 13, 2015). Precedent in this Circuit suggests a physician who treats an individual only twice or three times does not constitute a treating source. *See Kornecky*

*v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496,  506–07 (6th Cir. 2006) ("Depending on the

circumstances and the nature of the alleged condition, two or three visits often will not suffice

for an ongoing treatment relationship"); *Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 629

(6th Cir. 2016) ("It was not improper for the ALJ to discount Dr. Chapman's opinion on the

basis that he treated Kepke only three times over a three month period); *Mireles ex rel. S.M.M.*

*v. Comm'r of Soc. Sec.*, 608 Fed.Appx. 397, 398 (6th Cir. 2015);  *Helm v. Comm'r of Soc. Sec.*

*Admin.*, 405 Fed. Appx. 997, 1000–01 n. 3 (6th Cir. 2011.)  *See also Fleischer,* 774 F.Supp.2d at

879; *Pethers v. Comm'r of Soc. Sec.*, 580 F.Supp.2d 572, 579 n .16 (W.D. Mich.2008); *Carter v.*

*Berryhill*, 2017 WL 2544064 at * 9 (N.D. Ohio May 26, 2017), *report and recommendation*

*adopted by* 2017 WL 2537066 (N.D. Ohio June 12, 2017); *Witnik v. Colvin,* 2015 WL 691329 at

* 7 (N.D. Ohio Feb. 18, 2015); *Hickman v. Colvin*, 2014 WL 2765670 at * 12 (M.D. Tenn. June

18, 2014), *report and recommendation adopted by* 2014 WL 3404967 (M.D. Tenn. July 10,

2014).

  For the following reasons, the Court finds Dr. Ravakhah constituted Roche's "treating

physician" at the time he authored his May 2014 opinion.  As discussed *supra*, Dr. Ravakhah

personally examined Roche four times prior to the opinion at issue; i.e., in June 2012, December

2013, January 2014, and May 2014.  Although Dr. Ravakhah was Roche's primary care

physician and therefore addressed a variety of health concerns during these visits, the record

reflects Roche's chronic back and lower extremity pain was consistently addressed at each these

visits.  Specifically, Dr. Ravakhah's treatment records reflect the following:

- On June 22, 2012, Roche's chief complaints are listed as "back pain and ankle pain." (Tr.  532.)  During this visit, Roche reported a past medical history of (among other things) ankle problems and losing his balance. (*Id*.)  He complained of progressive low back pain and stated his "ankles

turn in when he stands, result[ing] in pain." (*Id.*) Dr. Ravakhah diagnosed contracture of ankle and foot joint, and referred Roche to a podiatrist. (Tr. 535.)

- On December 13, 2013, Roche complained of congestion and pain with deep breaths, but also reported he "still has some pain in his ankles when he stands up." (Tr. 412.) Dr. Ravakhah noted tenderness in Roche's bilateral ankles on examination, and described his ankle pain as "chronic." (Tr. 413.)

- On January 24, 2014, Roche's chief complaints were "bilateral ankle and knee and lower back pain." (Tr. 409.) He described the pain as "sharp" and rated it a 5 on a scale of 10, which Roche stated was "baseline for him." (Tr. 407, 410.) Dr. Ravakhah noted Roche had "congenital foot alignment abnormalities," wore bilateral ankle braces, and was taking pain medication. (Tr. 407.)

- On May 23, 2014, Roche complained of a variety of issues (hives, fatigue, sore throat), but Dr. Ravakhah nonetheless specifically noted Roche had "chronic back and knee pain, on pain medications." (Tr. 474.) He described Roche's pain as stable, advised him to continue his pain medication, and indicated Roche was "disabled from my standpoint" as a result of his chronic pain. (Tr. 475.)

In light of the above, the Court disagrees with the Commissioner's assertion that Dr. Ravakhah's treatment of Roche prior to the May 2014 opinion primarily related to "acute illnesses" rather than to Roche's chronic pain. To the contrary, it is clear from a review of these records that Dr. Ravakhah considered Roche's foot and ankle pain at each visit, and was well-aware of the chronic nature of his pain.[8] Under these circumstances, the Court finds Dr. Ravakhah's

---

[8] As noted *supra*, Dr. Ravakhah referred Roche to a podiatrist for treatment of his foot and ankle conditions. (Tr. 535.) Roche asserts (and the Commissioner does not contest) that, as his primary care physician and the referring provider, Dr. Ravakhah would have been aware of Roche's treatment with podiatrist Dr. Canales. (Doc. No. 11 at 16.) The record reflects that, prior to the May 2014 opinion at issue, Roche presented to Dr. Canales on several occasions, during which Dr. Canales repeatedly noted numerous abnormal examination findings (i.e., "severe collapse" of the medial arch, reducible deformity, decreased dorsiflexion, etc.) and described Roche's condition as a "significant deformity" that would like require surgical intervention. (Tr. 491, 492-493.)

treatment history with Roche was sufficient to qualify him as a "treating physician" at the time

he authored the opinion in question.[9]  *See e.g., Davila v. Comm'r of Soc. Sec*., 993 F.Supp.2d

737, 755 (N.D. Ohio 2014) (finding physician who examined claimant on five occasions

constituted a "treating physician").

     As Dr. Ravakhah constituted Roche's "treating physician" at the time of the May 2014

opinion, the ALJ was required to determine whether his opinion was entitled to "controlling

weight" and, if not, articulate "good reasons" for discounting Dr. Ravakhah's opinions regarding

Roche's physical functional limitations.  As another decision from this District recently

explained, evaluation of a "treating physician" opinion entails a two-step process:

> The Sixth Circuit in *Gayheart v. Commissioner of Social Security* recently
> emphasized that the regulations require two distinct analyses, applying two
> separate standards, in assessing the opinions of treating sources.  This does not
> represent a new interpretation of the treating physician rule.  Rather it reinforces
> and underscores what that court had previously said in cases such as *Rogers v.*
> *Commissioner of Social Security, Blakley v. Commissioner of Social Security*, and
> *Hensley v. Astrue*.
>
> As explained in *Gayheart*, the ALJ must first consider if the treating source's
> opinion should receive controlling weight.   The opinion must receive controlling
> weight if (1) well-supported by clinical and laboratory diagnostic techniques and
> (2) not inconsistent with other substantial evidence in the administrative record.
> These factors are expressly set out in 20 C.F.R. §§ 404.1527(d)(2).  Only if the
> ALJ decides not to give the treating source's opinion controlling weight will the
> analysis proceed to what weight the opinion should receive based on the factors
> set forth in 20 C.F.R. §§ 404.1527(d)(2)(i)–(ii), (3)–(6).   The treating source's

---

[9] The sole case cited by the Commissioner on this issue, *Rudd v. Comm'r of Soc. Sec*.,
531 Fed. Appx. 719 (6th Cir. 2013), is distinguishable.  In that case, the Sixth Circuit
found the ALJ did not err in determining the physician in question, Dr. Butler, did not
constitute a "treating physician" where "Rudd received treatment from Dr. Butler's office
four times in 2007 and 2008" but "the treatment notes [did] not establish that Dr. Butler
ever examined Rudd."  *Id*. at 729.  Here, the treatment records reflect (and the
Commissioner does not contest) that Dr. Ravakhah personally examined Roche at each of
the four visits in question.  Thus, *Rudd* is distinguishable from the instant case.

non-controlling status notwithstanding, "there remains a presumption, albeit a rebuttable one, that the treating physician is entitled to great deference."

The court in *Gayheart* cautioned against collapsing these two distinct analyses into one. The ALJ in *Gayheart* made no finding as to controlling weight and did not apply the standards for controlling weight set out in the regulation. Rather, the ALJ merely assigned the opinion of the treating physician little weight and explained that finding by the secondary criteria set out in §§ 1527(d)(i)–(ii), (3)–(6) of the regulations, specifically the frequency of the psychiatrist's treatment of the claimant and internal inconsistencies between the opinions and the treatment reports. The court concluded that the ALJ failed to provide "good reasons" for not giving the treating source's opinion controlling weight.

* * *

In a nutshell, the *Wilson/Gayheart* line of cases interpreting the Commissioner's regulations recognizes a rebuttable presumption that a treating source's opinion should receive controlling weight. The ALJ must assign specific weight to the opinion of each treating source and, if the weight assigned is not controlling, then give good reasons for not giving those opinions controlling weight.

*Sito v. Comm'r of Soc. Sec.*, 229 F. Supp.3d 633, 640-641 (N.D. Ohio 2017) (footnotes omitted). *See also Marks v. Colvin*, 201 F.Supp.3d 870, 875 (S.D. Ohio 2016).

Roche first asserts the ALJ erred in failing to determine, under the first step of the evaluation process set forth in *Gayheart, supra*, whether "controlling weight" should be accorded to Dr. Ravakhah's May 2014 opinions that Roche would require a sit/stand at will option and require the use of a cane for balance, and that his pain would interfere with concentration, lead to off task behavior, require additional breaks, and cause absenteeism.[10]

---

[10] Roche does not challenge the ALJ's rejection of Dr. Ravakhah's opinions that Roche was limited in his abilities to lift, carry, stand and walk. As noted above, the ALJ rejected these particular opinions on the grounds Dr. Ravakhah failed to detail any specific functional limitations with respect to Roche's abilities in these areas. Courts have found an ALJ properly rejects a physician opinion where it fails to provide useful guidance as to a claimant's specific functional limitations. *See e.g., Baker v. Astrue*, 617 F.Supp.2d 498, 509 (E.D. Ky. 2009) (ALJ properly rejected medical opinion where physician "cited to no . . . functional limitations of any kind"); *Rogers v. Astrue*, 2009

(Doc. No. 11 at 15.) The Court agrees. The ALJ's brief discussion of Dr. Ravakhah's opinion fails to either mention the "controlling weight" concept or properly assess the regulatory factors set forth in 20 C.F.R. § 404.1527(c)(2), i.e., whether the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with other substantial evidence in the case record."

As noted above, the only explanation offered by the ALJ with regard to Dr. Ravakhah's opinions on these issues is that "his opining to the claimant experiencing intense pain is unsupported by the greater weight of the record to include the claimant not being in formal pain management and Dr. Ravakhan's [sic] own treatment records showing conservative treatment." (Tr. 26.) The ALJ did not, however, address (at any point in the decision) the multiple objective and/or clinical findings tending to support Dr. Ravakhah's opinion, including:

(1) July 2012 x-rays of Roche's bilateral feet showing "severe uncovering of the talus, transverse plane deformity, severe plantar flexion of the talus, and decreased calcaneal pitch, and an April 2014 x-ray of Roche's right ankle showing increased talocaleneal angle and *pes planus*;

(2) abnormal examination findings of "severe collapse of the medial longitudinal arch," reducible deformity, decreased dorsiflexion of the knee, tenderness in the bilateral ankles and feet, antalgic and/or unstable gait, reduced hip and ankle strength, decreased range of motion, decreased endurance, impaired balance, and impaired posture,

(3) the physical therapist's findings that Roche was a "fall risk," and that his "foot and ankle ability measure 13%, indicating 87% functional impairment;"

(4) Roche's prescriptions for foot braces, arch supports, and a shower chair, as well as his use of a medically-necessary cane; and

WL 2423965 at * 7 (M.D. Tenn. Aug. 4, 2009) (ALJ properly rejected physician opinion as "vague" where opinion contained no "useful guidance" as to the claimant's specific limitations).

(5) Dr. Canales' oft-repeated opinion that surgical intervention was required to address Roche's severe foot deformities.

(Tr. 461, 463, 493, 491, 413, 489, 518-519, 541, 543, 651, 650, 643-648, 459-460.) Moreover, and as discussed in more detail below, the ALJ further fails to explain how the lack of formal pain management and/or Roche's "conservative treatment" bear any relevance to Dr. Ravakhah's opinion that Roche would require the use of a cane to *balance*. This is significant in light of the many references in the record to Roche's difficulty balancing and frequent falls. (Tr. 516, 518-519, 532, 562.) The ALJ's failure to properly conduct a controlling weight analysis (and, further, to address the foregoing objective and/or clinical evidence in discounting Dr. Ravakkhah's opinion) deprives the Court of the opportunity to meaningfully review whether he undertook the "two-step inquiry" required when analyzing treating source opinions. *See Gayheart*, 710 F.3d at 376–78 (stating the lack of explanation regarding the "controlling weight [analysis] hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation"). Such failure amounts to reversible error. *See Marks*, 201 F.Supp.3d at 882; 2014 WL 4080075, at *5 (S.D. Ohio Aug. 19, 2014) (citation omitted).

Moreover, assuming *arguendo* the ALJ had properly conducted a controlling weight analysis, the Court finds the ALJ failed to provide "good reasons" for rejecting Dr. Ravakhah's opinions that Roche would require a sit/stand at will option and require the use of a cane for balance, and that his pain would interfere with concentration, lead to off task behavior, require additional breaks, and cause absenteeism. As discussed above, if an ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent

42

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242. *See also Gayheart*, 710 F.3d at 376.

Here, the ALJ does not address the majority of the factors set forth in § 404.1527(c)(2), including the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, the treating source's specialization (or lack thereof), and the extent to which the source is familiar with other information in the case record. The ALJ does offer two reasons for rejecting Dr. Ravakhah's opinion; i.e., the lack of formal pain management and treatment records showing conservative treatment. (Tr. 26.) However, as noted above, the decision fails to explain how either of these reasons bear any relevance to Dr. Ravakhah's specific opinion that Roche requires a cane "to help him with *balance*." (Tr. 470.) As set forth *supra,* the record reflects Roche repeatedly complained of losing his balance, his ankles buckling, and experiencing "multiple falls, with about 2 per week." (Tr. 51, 532, 516, 562, 663.) Moreover, treatment records include numerous examination findings of unsteady gait, impaired balance, and the assessment of Roche as a "fall risk." (Tr. 518-519, 541, 459-460.) The ALJ fails to address any of this evidence in the decision or otherwise explain how it is inconsistent with Dr. Ravakhah's opinion Roche would require a cane for balance when standing.[11]

In addition, although the reasons provided by the ALJ ostensibly address the severity of Roche's pain, the ALJ failed to discuss (at any point in the decision ) either the objective

---

[11] The only mention of the issue of balance in the decision is earlier in the decision, when the ALJ concludes that "with him not requiring a two handed walker sufficiently demonstrates his ability to occasionally balance, operate foot controls, and climb ramps and stairs." (Tr. 23.) However, the ALJ does not address any of the medical evidence noted above regarding Roche's balance deficits, nor does he address the objective evidence documenting his severe foot deformities or Dr. Canales' repeated statements that Roche will require surgical intervention. (Tr. 23.)

evidence documenting Roche's severe foot deformities or the many treatment records and physical examining findings discussing his chronic foot and ankle pain. As has been discussed, x-rays of Roche's bilateral feet showed "severe uncovering of the talus," transverse plane deformity, severe plantar flexion of the talus, and decreased calcaneal pitch. (Tr. 493.) Dr. Canales diagnosed severe *pes vagos planus* (i.e., severely flexible flatfoot deformity), noted Roche's condition was a "significant deformity," and repeatedly indicated surgery was necessary. (Tr. 492-493, 491, 490, 489, 543, 544, 650, 651.) Indeed, in August 2014, Dr. Canales stated "I do not think that this problem will improve with nonoperative measures, as the deformity is severe." (Tr. 543.) He further indicated surgery "would be a major reconstructive undertaking approximately a year and a half recovery for each foot." (Tr. 489.) Examination findings included "severe collapse of the medial longitudinal arch," reducible deformity, decreased dorsiflexion of the knee, tenderness in the bilateral ankles and feet, antalgic and/or unstable gait, reduced hip and ankle strength, decreased range of motion, decreased endurance, impaired balance, and impaired posture. (Tr. 493, 491, 413, 489, 518-519, 541, 543, 651, 650, 643-648, 459-460.) Moreover, during physical therapy, it was determined Roche's "foot and ankle ability measure 13%, indicating 87% functional impairment." (Tr. 518.)

The ALJ does not address any of this evidence in the decision. She does not mention the objective test results noted above, nor does she discuss any of Dr. Ravakhah's or Dr. Canales' treatment notes in any detail. In light of the failure to acknowledge or discuss the above evidence, the Court cannot meaningfully review the ALJ's statement that Roche's pain is "unsupported by the greater weight of the evidence" because he is not in formal pain management and "treatment records showing such conservative treatment." (Tr. 26.) *See*

*Fleischer*, 774 F. Supp. 2d at 877 ("Even if there is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *Shrader v. Astrure*, 2012 WL 5383120 at * 6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011), *report and recommendation adopted by* 2011 WL 6122758 (S.D. Ohio Dec. 8, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010), *report and recommendation adopted by* 2010 WL 2929550 (N.D. Ohio July 27, 2010). Moreover, as Roche correctly notes, the ALJ's error is not harmless because the VE expressly testified no jobs would be available for an individual that required both a sit/stand at will option, and a cane for balance when standing. (Tr. 63.)

The Commissioner argues Dr. Ravakhah's opinion is not supported by his own treatment notes, citing records indicating Roche's pain was "stable" on pain medication and his asthma was well-controlled. (Doc. No. 12 at 20.) She maintains Dr. Ravakhah's treatment of Roche during the relevant time period was "sparse," and also emphasizes Dr. Ravakhah did not suggest Roche limit his activities and, instead, repeatedly instructed him to exercise regularly "with no restrictions on what he could and could not do." (*Id.*) Finally, the Commissioner notes that "although Dr. Ravakhah opined that plaintiff's pain wold interfere with his concentration and cause him to be off task, nothing in the doctor's treatment records document problems with concentration or attention." (*Id.*)

The ALJ, however, did not provide any of these explanations as reasons for discounting Dr. Ravakhah's opinion. It is well established the Commissioner cannot cure a deficient opinion

by offering explanations never offered by the ALJ. As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn v. Colvin,* 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue,* 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012). Here, the ALJ did not discount Dr. Ravakhah's opinion for any of the reasons cited by the Commissioner and, thus, this Court cannot consider them on appeal.[12] *See Schultz v. Comm'r of Soc. Sec*., 2016 WL 4577049 at * 6 (E. D. Mich. Aug. 10, 2016), *report and recommendation adopted by* 2016 WL 4538366 (E.D. Mich. Aug. 31, 2016) ("But Defendant's *post-hoc* rationalization of the ALJ's assessment of Drs. Kazmers and Rao's opinions does not cure the ALJ's failure to provide good reasons."); *Johnson v. Comm'r of Soc. Sec.,* 193 F.Supp.3d 836, 847 (N.D. Ohio 2016) ("[T]he Commissioner's *post hoc* rationalization for discounting Dr. Smarty's opinion is contrary to the law of Sixth Circuit. While. . . there are portions of Dr. Smarty's treatment notes showing that Plaintiff's condition had improved and was, in some respects, normal. . . , the ALJ did not cite this evidence as a basis for rejecting Dr. Smarty's opinion. Rather, this explanation appears for the first time in the briefing now before the Court. This Court 'may not accept appellate counsel's *post hoc* rationalizations for agency action.'") (quoting *Berryhill v. Shalala*, 4 F.3d 993, 1993 WL

---

[12] The Court acknowledges Dr. Ravakhah's opinion could be interpreted as internally inconsistent, in that he found no restriction as to Roche's ability to sit but nonetheless determined he would need a sit/stand/walk at will option. While this might be a basis for discounting Dr. Ravahaha's opinion as to this particular restriction, however, the ALJ did not articulate this reason in the decision. As noted above, the Court cannot engage in *post hoc* analysis.

361792 (6th Cir. 1993)).

Accordingly, and for all the reasons set forth above, it is recommended the Court find the ALJ failed to properly evaluate Dr. Ravakhah's May 2014 opinions that Roche would require a sit/stand at will option and require the use of a cane for balance, and that his pain would interfere with concentration, lead to off task behavior, require additional breaks, and cause absenteeism. It is further recommended this matter be remanded to afford the ALJ the opportunity to sufficiently evaluate and explain the weight ascribed to the above limitations assessed by Dr. Ravakhah.

### Consultative examiner Dr. Assaf

Roche further asserts remand is required because "the ALJ does not provide 'good reasons' for only granting consultative examiner Dr. Hasan Assaf's opinion 'some weight.'" (Doc. No. 11 at 20.) He argues "[d]espite the lack of specific amounts and times, this opinion . . . speaks to Mr. Roche's overall ability to sustain activity and notes the severity of his limitations." (*Id*.) Roche maintains the ALJ "could have requested interrogatories or a second examination rather than rely on her own medical assessment." (*Id*.) He claims that, taken together with the opinion of Dr. Ravakhah, Dr. Assaf's opinion "supports limitations in the areas of concentration, off task behavior, additional rest breaks, absenteeism, need for alternating positions and use of a cane while standing." (*Id*.)

The Commissioner first notes (correctly) that the ALJ was not procedurally required to give "good reasons" for the weight given to the opinion of a nontreating examining source such as Dr. Assaf. (Doc. No. 12 at 21.) She asserts the ALJ considered Dr. Assaf's opinion and properly discounted it on the grounds it was vague and inconsistent with his own findings that

Roche was not in significant pain and had only "moderate symptomatology." (*Id*. at 21-22.) Lastly, the Commissioner argues that "[a]lthough the ALJ may have found portions of Dr. Assaf's opinion to be vague, the ALJ is not therefore obligated to require an additional consultative exam or seek clarification." (*Id*. at 22.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i). Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions. *Id*. When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii). Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight. *Id.*

Here, the ALJ weighed Dr. Assaf's opinion as follows:

> Likewise, only some weight could be accorded to physical consultative examiner, Hasan Assaf, MD (9F). His opinion that the claimant had marked limitations in activities requiring prolonged walking, standing, bending, lifting, and squatting is not an actual functional opinion and is quite vague. Moreover, it is highly unlikely that the claimant has any marked limitations because Dr. Assaf s own examination findings to include the claimant not being in much actual pain and having negative straight leg raise testing indicate only moderate symptomology. Hence, only some weight could be accorded.

48

(Tr. 25.)

The Court finds the ALJ properly evaluated Dr. Assaf's opinion. The ALJ discussed Dr. Assaf's examination findings and expressly acknowledged his opinions regarding Roche's physical limitations. The ALJ accorded "only some weight" to Dr. Assaf's opinions and provided several reasons for doing so. Notably, the ALJ found Dr. Assaf's opinion that Roche had "marked limitations in activities requiring prolonged walking, standing, bending, lifting and squatting" was "not an actual functional opinion and is quite vague." (Tr. 25.) The Court finds the ALJ did not err in discounting Dr. Assaf's opinion on this basis. Dr. Assaf's report does not define the term "marked" or otherwise provide any specific functional limitations relating to the nature and extent of Roche's abilities to walk, stand, bend, lift or squat. Courts have found an ALJ properly rejects a physician opinion where it fails to provide useful guidance as to a claimant's specific functional limitations. *See e.g., Baker v. Astrue*, 617 F.Supp.2d 498, 509 (E.D. Ky. 2009) (ALJ properly rejected medical opinion where physician "cited to no . . . functional limitations of any kind"); *Rogers v. Astrue*, 2009 WL 2423965 at * 7 (M.D. Tenn. Aug. 4, 2009) (ALJ properly rejected physician opinion as "vague" where opinion contained no "useful guidance" as to the claimant's specific limitations).[13]

_____

[13] The ALJ also discounted Dr. Assaf's opinion on the ground it was inconsistent with his own examination findings. (Tr. 23.) Earlier in the decision the ALJ acknowledged Dr. Assaf's examination findings of abnormal gait, tenderness over the ankles and knees, and flat feet. (Tr. 23.) The ALJ also, however, noted several normal examination findings in Dr. Assaf's report, including that Roche was in no acute distress and had negative straight leg raise and stable joints with no swelling or effusion. (Tr. 25, 459-460.) The Court also notes Dr. Assaf found Roche had no sensory deficit, normal pulses, no edema in his extremities, no scoliosis in his thoracic spine, and needed no help changing for the exam or getting on/off the exam table. (Tr. 459-460.) While there are certainly many abnormal examination findings in the medical record (as discussed above), the Court cannot say there is not substantial evidence to support the ALJ's finding that Dr. Assaf's

49

Moreover, Roche has not demonstrated that where, as here, the record contains numerous treatment records and medical opinions, the ALJ was required to further develop the record by issuing interrogatories or ordering an additional consultative examination. *See e.g., Robertson v. Comm'r of Soc. Sec.*, 513 Fed. Appx. 439 at * 2 (6th Cir. 2013) (finding that, because the record contained test results, physicians' notes, opinion evidence from multiple physicians, and lacked any significant inconsistencies in the evidence, the ALJ was not obligated to order a consultative examination with a cardiologist or obtain additional medical record); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." )(quoting *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 214 (6th Cir.1986)).

In sum, the ALJ acknowledged Dr. Assaf's opinion and articulated several reasons for discounting it. As the Commissioner correctly notes, Dr. Assaf was not Roche's treating physician and, therefore, the ALJ was not required to satisfy the "good reasons" requirement in rejecting his opinion. *See Taylor v. Colvin*, 2013 WL 6162527 at * 16 (N.D. Ohio Nov. 22, 2013) ("Notably, the procedural 'good reasons' requirement does not apply to non-treating physicians"). The analysis provided by the ALJ is sufficient to satisfy the explanation requirements for non-treating, examining physicians.

Accordingly, it is recommended the Court find the ALJ did not err in according only

---

determination of "marked limitations" was inconsistent with his certain aspects of his own examination report.

"some weight" to Dr. Assaf's opinion regarding Roche's physical functional limitations. This assignment of error is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends the Commissioner's final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 12, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**